IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

ONRC ACTION, an Oregon non-profit corporation,

                         Plaintiff,

        v.

UNITED STATES BUREAU OF
RECLAMATION and MICHAEL L. CONNOR,[1]
in his official capacity as Commissioner of the
Bureau of Reclamation,

                      Defendants,

OREGON WATER RESOURCES
CONGRESS, KLAMATH BASIN WATER
USERS PROTECTIVE ASSOCIATION,
and KLAMATH DRAINAGE DISTRICT,

                    Defendant-Intervenors.

Civ. No. 97-3090-CL

REPORT & RECOMMENDATION

CLARKE, Magistrate Judge.

---

[1] In accordance with Fed. R. Civ. P. 25(d), which allows for substitution when, among other reasons, "a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending [,]" the court hereby substitutes Michael Connor, Commissioner of the Bureau of Reclamation ("the Bureau") for former Bureau Commissioner, Eluid L. Martinez.

Page 1 – REPORT AND RECOMMENDATION

This matter comes before the court on defendants' motion (#198) for summary judgment and plaintiff's cross motion (#205) for partial summary judgment. For the reasons stated below, defendants' motion should be GRANTED and plaintiff's motion should be DENIED.

## BACKGROUND

Originally filed on December 1, 1997, this action is brought as a citizen suit under § 505(a) of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a). Plaintiff ONRC Action ("ONRC")[2] alleges that defendants the United States Bureau of Reclamation and its Commissioner in his official capacity (collectively, "the Bureau") have violated the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act ("CWA" or "the Act"), 86 Stat. 816, codified as amended, 33 U.S.C. § 1251, *et seq.*, by discharging pollutants into the Klamath River without the necessary permit, in violation of § 301(a) of the Act, 33 U.S.C. § 1311. Motions to intervene as defendants filed by Klamath Basin Water Users Protective Association ("KWUPA") and Klamath Drainage District ("KDD") (#7), and Oregon Water Resources Congress ("OWRC") (#15), were granted in early 1998.

On January 25, 2000 (#39), the case was stayed while the parties engaged in extensive settlement discussions. On August 10, 2004, the case was dismissed (#101) by agreement (#100) of the parties, who continued to engage in settlement discussions. Significant developments in the relevant law occurred after the case was dismissed. On July 1, 2009, the case was reopened on motion (#172) by ONRC. On June 7, 2010, the Bureau and ONRC simultaneously filed cross motions seeking full and partial summary judgment, respectively.[3]

---

[2] Klamath Forest Alliance ("KFA") was also named as plaintiff in the Complaint. However, on August 28, 2009, KFA's claims were dismissed (#181) with prejudice due to its failure to appear and prosecute its claims.

[3] Also before the court is ONRC's request for judicial notice (#253).

Page 2 – REPORT AND RECOMMENDATION

Two issues govern the motions before the court. The first issue is whether the Klamath Straits Drain, a drainage canal connecting the Lower Klamath Lake and the Klamath River, is a "water of the United States" as defined by the CWA, such that the discharge of water from the Klamath Straits Drain to the Klamath River is exempted from the Act's NPDES permitting system by the Water Transfers Rule, 40 C.F.R. 122.3(i). If so, the second issue is whether this court has jurisdiction to adjudicate ONRC's claim that the Water Transfers Rule is not authorized by the CWA and thus invalid as an ultra vires act.

This action is but a piece of a much larger, complex legal battle over the rights and priorities of competing uses and users to the waters of the Klamath Basin. A brief overview of the universe of relevant facts and history is both appropriate and useful.

# I. FACTUAL

The Klamath Irrigation Project ("the Klamath Project" or "the Project"), authorized by Congress in 1905, Act of February 9, 1905, ch. 567, 33 Stat. 714 (codified at 43 U.S.C. § 601), was one of the first projects to be authorized under the National Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified, as amended, at 43 U.S.C. §§ 371 *et seq.*). The Project straddles the Oregon-California border, covering territory in Oregon's Klamath County and California's Siskiyou and Modoc Counties[4] and providing irrigation services to some 210,000 acres of land through a complex system of dams, pumping plants, canals, laterals, tunnels, and drains. The Klamath Project service area also encompasses four wildlife refuges: the Lower Klamath Refuge, Tule Lake Refuge, Clear Lake Refuge, and Upper Klamath Refuge.

---

[4] Since much of the area to be served by the Klamath Project consisted of submersed lands, Congress expressly authorized the Secretary of the Interior to raise or lower the level of Lower Klamath Lake and Tule Lake. Act of February 9, 1905, ch. 567, 33 Stat. 714 (codified at 44 U.S.C. § 601). Consistent with the provisions of the Reclamation Act, Oregon and California were required to cede their rights and title to these lands to the United States. *See* OR. GEN. LAWS, 1905, ch. 5, § 1, pp. 63; CAL. STATS. 1905, pp. 4, February 3, 1905.

The Project utilizes two primary water sources:  Upper Klamath Lake and the Klamath

River, and the waters of the Lost River Basin, which include Clear Lake, the Lost River, and

Tule Lake.  Before human intervention and engineering, the Lost River Basin was a closed

system whose waters originated in Clear Lake, which emptied into the Lost River, which in turn

drained into Tule Lake, an evaporation sump.  (Decl. of Austin D. Saylor ("Saylor Decl."), Ex.

10, pp. 4).[5]  The waters of Upper Klamath Lake flowed into the Link River, which in turn

emptied into Lake Ewauna, the true headwaters of the Klamath River, which flows south and

west to empty into the Pacific Ocean.  (Id.).  During spring freshets the Klamath River would

overflow, draining through the Klamath Straits and the marshy wetlands adjacent to the river into

Lower Klamath Lake, a big, shallow sump.  (Id.).  These annual floods would "often" fill the

entire 140-square mile bed of Lower Klamath Lake, creating an expanse of more than 80,000

acres of open water and marshland.  (Id., Ex. 1, pp. 12).  As the floodwaters receded, Lower

Klamath Lake would shrink back to its normal size until it lay surrounded once again by some

40,000 acres of swampy marshlands.  (Id., Ex. 10, pp. 8).

The unique habitat created by the interplay of the Klamath River, its adjacent wetlands,

the Klamath Straits, and Lower Klamath Lake served as the breeding ground for thousands of

waterfowl and a resting place for one of the largest concentrations of migratory waterfowl in the

nation.  (Id., Ex. 10, pp. 4).  Early opportunists took advantage of the concentrated populations to

hunt and kill thousands of birds for their plumage, as game, and for sport.  (Id., Ex. 3, pp. 6 &

Ex. 10, pp. 2-4).  In response to preservationist protests to the wholesale slaughter of these birds,

President Theodore Roosevelt signed Executive Order No. 924 on August 8, 1908, designating

81,619 acres of the Lower Klamath Lake and surrounding marshland as a "preserve for breeding

---

[5] The court's citations to the record reflect the page numbers generated at the top of a PDF
document by the court's Electronic Case Filing system, not page numbers appearing on original
exhibits.

birds." (Id., Ex. 10, pp. 6). In 1915, President Wilson signed Executive Order No. 2202, withdrawing more than 7,000 acres from the Lower Klamath refuge and making that land available for homesteading in response to political pressure from would–be homesteaders.

Travel by and across these waters by the local tribes is recorded as early as 1846. (Id., Ex. 2, pp. 3). Early settlers built and used sailboats and steamboats to ferry passengers across the rivers and lakes or the Klamath Basin starting in 1862. (Id., Ex.1, pp. 10). Barges were used to transport mail across Lower Klamath Lake to Fort Klamath, built in 1863, followed by the first steamboat in 1879, the 65 foot *General Howard*. (Id., Ex. 2, pp. 6). In 1889, the steamboat *Mayflower* was built for use on the Klamath River, and in 1891 was acquired and used to haul lumber and hay barges from Keno, a city on the Klamath River in Oregon, to various points on Lower Klamath Lake in California, including Lairds Landing at the far southernmost edge of the lake. (Id., Ex. 1, pp. 10; Ex. 2, pp. 3; Ex. 7; Ex. 10, pp. 12). The steamers *Canby*, its successor *Canby II*, and the *Klamath*, later followed similar routes, using the seasonal currents to help facilitate the transport of their cargo as water flowed into and out of Lower Klamath Lake from the Klamath River in the spring and fall, respectively. (Id., Ex. 2, pp. 3).

Both the *Canby* and the *Klamath* were inspected by the government and licensed as commercial and passenger carriers. (Id., pp. 4). At 48 tons and 67 feet long, the *Canby II* is recorded as hauling 100 ton loads using two 50 ton barges. (Id., pp. 4). At 69 tons, 75 feet long, and 18 feet wide, the *Klamath* was the largest boat recorded to operate on this route. (Id., pp. 5). The *Buffalo*, a flat bottomed freighter using a gasoline engine and makeshift sails, was also used to tow logs from the sawmills in Klamath Falls and Keno through the Straits, across Lower Klamath Lake, and through the Adams Cut to White Lake. (Id., pp. 4). Smaller steamboats such as the *Lorrie C.* and gasoline launches such as the *Tule* and the *Ewauna* are also recorded as

operating in the area. (Id., pp. 4-5). These boats served as a critical link in the transportation

system for early settlers until the completion of the railroad into Klamath Falls in May of 1909

effectively brought this travel to an end. (Id., pp. 4-5).

In 1907, the California Northeastern Railway contracted with the Reclamation Service for

the right to construct an embankment across the northwestern end of the Lower Klamath marsh

for the purpose of laying tracks. (Id., Ex. 1, pp. 12 & Ex. 3, pp. 8-9). Because the Act of 1905

authorized the raising and lowering of Lower Klamath Lake without expressly closing the Lake

to navigation, the United States was obligated to assume all responsibility for any interruption to

navigation under the terms of the contract. (Id., Ex. 15,[6] pp. 4-5). The Service required that the

embankment be constructed according to its specifications such that it could also serve as a

levee, and retained exclusive rights to regulate the flow of water to and from Lower Klamath

Lake by requiring that the embankment also include a passageway for water at Klamath Straits.

(Id., Ex. 10, pp. 11).

The Klamath Lake Navigation Company sued the California-Northeastern Railway

Company and Southern Pacific Company in 1909, seeking to enjoin the construction and

maintenance of the railroad berm and alleging damages to its business, described as the transport

of passengers and merchandise by steamboat from points on the Klamath River through the

Klamath Straits to points on Lower Klamath Lake, as the result of the berm's construction.

(Saylor Decl., Ex. 11). The railways admitted that both steamboats and gasoline launches

operated along this navigational route, but discounted the commercial value of these operations

by characterizing the endeavor as one fraught with difficulty and lacking in commercial value,

asserting that the Straits and the Lake were "exceedingly shallow bodies of water encumbered

---

[6] Fund for Reclamation of Arid Lands, Message from the President of the United States
Transmitting a Report of the Board of Army Engineers in Relation to the Reclamation Fund,
House Report no. 1262, Section XXI, pp. 120-21, 61st Congress, 3rd Session, 1911.

with large mud banks and masses of vegetable matter," rendering navigation "impracticable . . .

save in the very brief period of extreme high water." (Id., Ex. 12, pp. 28-29). The case was

dismissed on stipulation of the parties in 1917. (Id., Ex. 13).

Construction of the berm was completed on April 4, 1909. (Id., Ex. 11, pp. 7 & Ex. 12,

pp. 18). Local landowners, anxious to drain their lands, organized as the Klamath Drainage

District in 1915 and successfully lobbied to have the passageway headgates permanently closed

in 1917, cutting off Lower Klamath Lake's source of water. (Id., Ex. 1, pp. 12). As a result, the

Lower Klamath National Wildlife Refuge drained. By 1922, all that remained of Lower Klamath

Lake was a 365 acre sump. (Id., Ex. 10, pp. 15). It remained that way until 1942, when

reflooding Lower Klamath Lake was proposed as a solution to the problem of human interests

threatened by flooding in Tule Lake on the other side of Sheepy Ridge. (Id., pp. 24).

The completion of the Clear Lake Dam in 1910 and the Lost River Diversion Dam in

1912 cut off water to Tule Lake. Homesteaders began cultivating the exposed lake bed as the

lake dried up, channeling their agricultural runoff into the Tule Lake sump. (Id., Ex. 10, pp. 24).

In 1928, President Coolidge signed Executive Order 4975, designating 10,300 acres of the Tule

Lake sump as a federal wildlife refuge. (Id.). In 1936, President Franklin D. Roosevelt signed

Executive Order No. 7341, which more than tripled the size of the Tule Lake wildlife refuge to

37,000 acres. (Id.). This expansion, which coincided with the threat that Tule Lake would

overflow and flood adjoining farmland, proved insufficient to handle the increased volume

agricultural runoff from an ever expanding number of homesteaders and continuing wet weather

cycles. (Id., pp. 24-25). The Reclamation Service solved the problem by building a six-

thousand-foot tunnel through Sheepy Ridge and pumping the Tule Lake overflow through the

tunnel into the "P" canal system and into the then dry Lower Klamath Lake bed. (Id., pp. 25;

Page 7 – REPORT AND RECOMMENDATION

Pl's Concise Statement of Material Fact in Supp. of Pl's Mot. for Part. Summ. J. ("Pl's CSMF"),

Ex. G, pp. 3).

As the result of continuing wet weather cycles, the influx of water from Tule Lake proved

to be more than the Lower Klamath Lake refuge could handle. (Saylor Decl., Dckt. # 203, Ex.

10, pp. 26). In 1943, the Reclamation Service again proposed to solve the resulting flooding

problem by building an outlet from the Lower Klamath Lake into the Klamath River. (Id. at pp.

27). The Klamath Straits were excavated and channelized, and now function as a drain.

Constructed in the 1940s and enlarged in 1976, the Klamath Straits Drain ("KSD" or "the

Drain") runs 8.5 miles from the Oregon-California border to the Klamath River. (Pl's CSMF,

Ex. G, pp. 3). Inflow to the Drain from the California part of the Klamath Basin is controlled by

a headgate situated beneath the Stateline Highway in Siskiyou County, approximately 1/2 mile

south of the Oregon-California border. (Decl. of Jennifer L. Birri in Supp. of U.S. Bureau of

Reclamation's Supplemental Br. on Clean Water Act Jurisdiction ("Birri Decl."), Dckt. # 275,

Ex. 3, pp. 1 & 4, pp. 29-30). From there, the Drain runs north and west, using two pumping

stations (the "E/EE" and "F/FF" pumping stations) along the way to move the water up to the

elevation necessary to allow the water to drain into the Klamath River. (Decl. of Michael L.

Green ("Green Decl."), Dckt. #201, ¶ 3). From the "F/FF" pumping station, water from the

Drain flows as the result of gravity for approximately two miles to the point of confluence with

the Klamath River, which lies between river mile 239 and 240 near the southwestern end of Gorr

Island. (Complaint, ¶ 12; Decl. of Michael L. Green in Supp. of U.S. Bureau of Reclamation's

Supplemental Br. on Clean Water Act Jurisdiction ("Supplemental Green Decl."), Dckt. # 274,

¶¶ 3, 10, & Ex. 1).

Water from the Klamath River is diverted at several points upstream from the point of its

confluence with the Drain, including the Lost River Diversion Channel,[7] the North Canal Intake,

and the Ady Canal Intake. (*See* Def. U.S. Bureau of Reclamation's Resp. to Pl. ONRC Action's

Mot. for Part. Summ. J. ("Def's Resp. in Opp'n"), Dckt. # 220, Ex. 1; Birri Decl., Ex. 6, pp. 11,

13-14). This water is distributed throughout the Klamath Project where it mingles with water

from the Lost River watershed, is collected in Lower Klamath Lake and from there channeled

into the Drain which conveys it back to the Klamath River. (*See generally*, Birri Decl., Ex. 6,

pp. 8-14). Water from three perennial, spring-fed streams—the Sheepy, Cottonwood, and

Willow Creeks—is also carried to the Klamath River by the Drain. (Supplemental Green Decl.,

¶ 8).

The Drain contains water throughout its entire length year-round. (Supplemental Green

Decl., ¶ 4). The Bureau operates the pumps as needed to keep the water level in the Drain

between its minimum operating elevation (4,073 feet above sea level) and maximum operating

elevation (4,095 feet above sea level). (Id., ¶ 6). The canal invert, or bottom of the Drain, is at

4,068 feet above sea level. (Id.). The "E/EE" and "F/FF" pumping stations are not always

active. (Id., ¶¶ 5, 6). The Bureau maintains records of the water flow through "E/EE" and F/FF"

pumping stations, measured in cubic feet per second ("CFS"). (Birri Decl., ¶ 2-5). These

records show that between January 2, 1987, and August 22, 2011, a period of 8,995 days, either

the F of FF plant was in operation on 8,402 days, with a recorded minimum daily flow rate of 8

acre feet ("AF") (2.6 million gallons), a maximum daily flow rate of 594 AF (193.6 million

gallons), and an average daily flow rate of 197 AF (64.2 million gallons). (Id., ¶¶ 6-7 & Ex. 1).

---

[7] The Lost River Diversion Channel is designed to allow water flow in both directions between
the Klamath River and the Lost River, such that water from either river can be diverted to the
other depending on the season and the Bureau's operational requirements. (Birri Decl., Ex. 6,
pp. 11).

Although the Drain is no longer actively used for interstate travel or commerce, boats are currently used on portions of both Lower Klamath Lake and the Drain, primarily for hunting. (Green Decl., ¶ 6).

## II. REGULATORY

The Clean Water Act ("CWA" or "the Act"), 86 Stat. 816, codified as amended, 33 U.S.C. § 1251, *et seq.*, is the nation's primary water pollution control law. The Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The regulatory focus of the CWA is limiting the "discharge of pollutants," a term broadly defined by the Act as meaning, in relevant part, "any addition of any pollutant[8] to navigable waters from any point source[.]" Or. Natural Desert Ass'n v. Dombeck ("ONDA"), 172 F.3d 1092, 1096-97 (9th Cir. 1998), *cert. denied*, 528 U.S. 964, 120 S.Ct. 397 (1999); 33 U.S.C. § 1362(12). "Point source" is, in turn, broadly defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

While the Act recognizes that nonpoint source pollution also contributes to the degradation of water quality, it "provides no direct mechanism to control nonpoint source pollution." ONDA, 172 F.3d at 1097. Instead, the Act directs the EPA to issue information including "guidelines for identifying and evaluating" nonpoint sources of pollution and "processes, procedures and methods to control pollution" attributable to them, 33 U.S.C. § 1314(f), and then employs both stick and carrot to encourage the states to regulate nonpoint source pollution by requiring the states to adopt programs for managing this pollution and

---

[8] § 502(6) of the Act defines "pollutant" as including, among other things, "solid waste, . . . sewage, garbage, sewage waste, . . . chemical wastes, biological materials, . . . heat, . . . municipal and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

making federal grants available for the construction of wastewater treatment facilities, 33 U.S.C.

§§ 1288, 1329; *see also* ONDA, 172 F.3d at 1097.

### A. National Pollutant Discharge Elimination System ("NPDES")

In order to achieve its goals, § 301(a) of the Act makes unlawful the discharge of any

pollutant by any person subject to several exceptions and as authorized by specified permitting

sections of the Act. Natural Res. Def. Council, Inc. v. Cnty. of Los Angeles, 636 F.3d 1235,

1238 (9th Cir. 2011) (*citing* S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians

("Miccosukee"), 541 U.S. 95, 102, 124 S.Ct. 1537 (2004) (*quoting* 33 U.S.C. §§ 1311(a)). The

permitting provision at issue in this case is § 402, the National Pollutant Discharge Elimination

System ("NPDES"). 33 U.S.C. § 1342.

Pursuant to § 402(a), the Administrator of the EPA may issue permits authorizing the

discharge of pollutants in accordance with specified conditions. 33 U.S.C. § 1342(a); *see also*

Arkansas v. Oklahoma, 503 U.S. 91, 101–02, 112 S.Ct. 1046 (1992) (describing NPDES

permitting system). "The authority to administer the NPDES permit system may be delegated to

a state or regional agency where the state or regional regulatory scheme meets certain criteria."

Russian River Watershed Prot. Comm. v. City of Santa Rosa, 142 F.3d 1136, 1138 (9th Cir.

1998) (*citing* 33 U.S.C. 1342(b)). The authority to administer the NPDES program in Oregon

was delegated to the Oregon Department of Environmental Quality ("ODEQ") in 1974. *See* 39

Fed. Reg. 26,061 (July 16, 1974); OR. REV. STAT. § 468B.050 (2009).

A NPDES permit holder must follow the requirements of numerous provisions of the Act,

including effluent limitations, water-quality standards, water monitoring obligations, public

reporting mechanisms, and certain discharge requirements. *See* 33 U.S.C. § 1342(a). However,

certain activities are categorically exempt from the § 402 permitting process, such as irrigation

return flows and stormwater runoff from oil, gas, and mining operations.  33 U.S.C. § 1342(l).

**B.  The "Unitary Waters Theory"**

The "unitary waters theory" asserts that all bodies of water which fall within the CWA's

definition of "navigable waters" as "waters of the United States" are inseparable parts of a single

whole.  From this premise, the theory derives the rule that a pollutant enters the "waters of the

United States" only once, at which point the pollutant, like the body of water it is discharged

into, becomes part of the single whole.  Thus, the theory concludes that nothing is "added" to the

"waters of the United States" by virtue of the confluence of a polluted body water with any other

body of water.  Put another way, "[i]f one takes a ladle of soup from a pot, lifts it above the pot,

and pours it back into the pot, one has not 'added' soup or anything else to the pot."

Miccosukee, 541 U.S. at 109-110 (*quoting* Catskill Mountains Ch. of Trout Unlimited, Inc. v.

City of New York ("Catskills I"), 273 F.3d 481, 492 (2nd Cir. 2001)).

Between 1991 and 2006, the "unitary waters" theory, its premise, or both, were

considered and rejected by the First, Second, Ninth, and Eleventh Circuit Courts of Appeal.  *See*

Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1217-18 (11th Cir. 2009)

(collecting cases), *rehg denied*, 605 F.3d 962 (2010), *cert. denied*, 131 S.Ct. 643 (2010).

However, in 2004 the Supreme Court vacated the Eleventh Circuit opinion and remanded the

case for additional proceedings to determine whether the two bodies of water were

"meaningfully distinct."  Miccosukee, 541 U.S. at 112, *vacating and remanding* Miccosuke

Tribe v. S. Fla Water Mgmt Dist., 280 F.3d 1364 (11th Cir. 2002) (holding that where a

navigable water contained "pollutants" as defined by the Act, a NPDES permit was required for

transferring that navigable water into another navigable water).  In so doing, the Supreme Court

declined to decide the merits of the defendant's "unitary waters" argument, noting that while "several NPDES provisions might be read to suggest a view contrary to the unitary waters approach," the defendant failed to identify any document, decision, or regulation issued by the EPA addressing this theory, and the issue had not been raised in the proceedings below. Id. at 107-109. Therefore, the Court held that the "unitary waters" theory would be available to the parties on remand. Id. at 112.

## C. The Water Transfer Rule

In 2005, the EPA issued a memorandum interpreting the applicability of § 402 of the CWA to "water transfers," defined as "any activity that conveys or connects navigable waters (as that term is defined in the CWA) without subjecting the water to intervening industrial, municipal, or commercial use." Memorandum from Ann R. Klee, Gen. Counsel, & Benjamin H. Grumbles, Assistant Adm'r for Water, to Regional Adm'rs, U.S. Envtl. Prot. Agency (Aug. 5, 2005), *available at* http://www.epa.gov/npdes/pubs/water_transfers.pdf. As defined by the EPA, "[t]he precise legal question addressed [in the memorandum was] whether the movement of pollutants from one navigable water to another by a water transfer is the 'addition' of a pollutant potentially subjecting the activity" to the NPDES permitting system. Id. The EPA concluded that Congress intended water transfers to be supervised and regulated by the states rather than being regulated under the NPDES permitting system. Id. In 2006, the Second Circuit Court of Appeals considered and rejected the EPA's conclusion under the "power to persuade" standard made applicable to informal agency interpretations by Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161 (1944) and U.S. v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164 (2001). Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of New York ("Catskills II"), 451 F.3d 77 (2006), *cert. denied*, 549 U.S. 1252, 127 S.Ct. 1373 (2007).

The memorandum gave notice of the EPA's intent to initiate a rulemaking process to address water transfers, which it commenced in 2006 by publishing a proposed regulation to exempt water transfers from the NPDES permitting system.  NPDES Water Transfers Proposed Rule, 71 Fed. Reg. 32,887 (proposed June 7, 2006) (to be codified at 40 C.F.R. § 122.2).  The Proposed Rule announced the EPA's intent to amend its CWA regulations to expressly exclude water transfers, defined as "an activity that conveys waters of the United States to another water of the United States without subjecting the water to intervening industrial, municipal, or commercial use," from the NPDES permitting system.  Id. at 32,889.  The EPA's stated rationale for the rule was to conform administration of the Act with Congressional intent to create "a balance between federal and State oversight of activities affecting the nation's waters."  Id. at 32,890.

The EPA cited several provisions of the CWA in support of this rationale:  section 101(b)[9] (recognizing that the primary responsibility for the "development and use (including restoration, preservation and enhancement) of land and water resources" lies with the states); sections 101(g)[10] and 510(2)[11] (preserving the authority of the states to allocate water rights); and section 304(f)[12] (directing the EPA to issue processes, procedures and methods to control pollution from various sources and activities including "changes in the movement, flow or circulation of any navigable waters or ground waters, including the changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities").  Id.  The EPA found further support that Congress intended water transfers to be supervised and regulated by the states, rather than through the NPDES permitting process, in the legislative history of

---

[9] 33 U.S.C. § 1251(b)
[10] 33 U.S.C. § 1251(g)
[11] 33 U.S.C. § 1370
[12] 33 U.S.C. § 1314(f)

sections 101(g), 304(f), and 208[13] of the Act. Id. at 32,891.  The EPA specifically sought

comment on an option considered, but not proposed, that would add a provision to the rule

"allowing States to designate particular water transfers as subject to the NPDES program on a

case-by-case basis." Id. at 32,892.

On June 13, 2008, the EPA issued the rule in its final form.  NPDES Water Transfers

Rule, 73 Fed. Reg. 33,697 (2008) (codified at 40 C.F.R. § 122.3(i)) ("the Water Transfers Rule"

or "the Rule").  The Rule, substantially identical in form and reasoning to the proposed rule,

defines "water transfers" as "an activity that conveys or connects waters of the United States

without subjecting the transferred water to intervening industrial, municipal, or commercial use,"

and declares such water transfers to be exempt from the NPDES permitting system because such

water transfers "do not result in the 'addition' of a pollutant." Id. at 33,699.

After the EPA issued the final Water Transfer Rule, petitions for review of the Rule were

filed in the First, Second, and Eleventh Circuit Courts of Appeal.  Friends of the Everglades v.

EPA, No. 08-13652 (11th Cir.); Miccosukee Tribe of Indians of Florida v. EPA, No. 08-13653

(11th Cir.); Florida Wildlife Federation v. EPA, No. 08-13657 (11th Cir.); Environment America

v. EPA, No. 08-1853 (1st Cir.); Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA, No.

08-3203 (2d Cir.).  Pursuant to 28 U.S.C. § 2112(a)(3), the Judicial Panel on Multidistrict

Litigation selected the Eleventh Circuit to hear all of the petitions.  Additional petitions for

review were subsequently filed in the Eleventh Circuit, which consolidated all of the petitions.

On June 4, 2009, the Eleventh Circuit Court of Appeals issued its opinion considering

and upholding as reasonable the EPA's interpretation of the term "addition" in the Water

Transfer Rule under the deferential standard made applicable to judicial review of formal notice-

and-comment rulemaking by administrative agencies by Chevron v. Natural Res. Def. Council,

---

[13] 33 U.S.C. § 1288

Page 15 – REPORT AND RECOMMENDATION

Inc., 467 U.S. 837, 104 S.Ct. 2778 (1984). Friends of the Everglades, 570 F.3d at 1227-28. The

Eleventh Circuit issued its mandate in Friends of the Everglades on December 2, 2010.

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material of fact and that the moving party is entitled to judgment as a matter of

law. FED. R. CIV. P. 56(a) (2010)[14]; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106

S.Ct. 2505 (1986). The moving party has the initial burden of showing that no genuine issue of

material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986);

Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the

evidence or determine the truth but may only determine whether there is a genuine issue of fact.

Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine

"'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Anderson, 477

U.S. at 248).

When a properly supported motion for summary judgment is made, the burden then

shifts, and the opposing party must set forth specific facts showing that there is a genuine issue

for trial. Anderson, 477 U.S. at 250; Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir.

1995). Conclusory allegations, unsupported by factual material, are insufficient to defeat a

---

[14] Rule 56 was amended effective December 1, 2010, after the parties' motions for summary
judgment were filed. Although there is a slight language change and a change in the designation
of subsections, the legal standard remains the same. See FED. R. CIV. P. 56(a) (eff. Dec. 1, 2010)
("The court shall grant summary judgment if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law.") The relevant
text of the prior rule stated that summary judgment is appropriate "if the pleadings, the discovery
and disclosure materials on file, and any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P.
56(c)(2) (effective prior to December 1, 2010). The minor change in language between the old
Rule 56(c)(2) and the revised Rule 56(a) has no effect on the court's ruling here.

motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the

opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. Devereaux, 263 F.3d at 1076. Put another way,

summary judgment should be granted when the nonmoving party fails to offer evidence from

which a reasonable jury could return a verdict in its favor. Anderson, 477 U.S. at 252. In

assessing whether a party has met its burden, the court views the evidence in the light most

favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir.

1995). When viewing the evidence at this stage, all justifiable inferences are drawn in favor of

the nonmoving party. Anderson, 477 U.S. at 255; Gibson v. Cnty. of Washoe, 290 F.3d 1175,

1180 (9th Cir. 2002).

## PROCEDURAL ISSUE

To prevail in this citizen suit action under the CWA, ONRC must establish five elements:

(1) the discharge, (2) of a pollutant, (3) from a point source, (4) to navigable waters, (5) without

a NPDES permit. 33 U.S.C. § 1311(a). In its motion for partial summary judgment, ONRC

argues that the Bureau has admitted the last four elements of this claim and seeks to limit the

issues at trial to the single issue of whether there is a "discharge," defined as "any addition of

any pollutant to [the waters of the United States] from any point source." 33 U.S.C. § 1362(12).

ONRC also seeks summary judgment on whether the irrigation return flow exception or the

Water Transfers Rule exception applies on the facts of this case. Defendant intervenors

KWUPA and KDD argue that ONRC's motion does not seek adjudication of an entire claim and

is therefore procedurally defective. The Bureau argues that ONRC's motion must fail because it

has not established the "addition" element of its claim, and further argues that this court lacks

jurisdiction to hear ONRC's challenge to the Water Transfers rule.

A party may move for summary judgment on any claim or defense, either in whole or in part. FED. R. CIV. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."). Within the Ninth Circuit, several courts have held that a motion which seeks a finding that a defendant may not as a matter of law assert a particular affirmative defense is proper under Rule 56. *See, e.g.*, Mullaney v. Hilton Hotels Corp., 634 F.Supp.2d 1130, 1159-60 (D. Hawai'i 2009); U.S. v. Union Pacific R.R. Co., 565 F.Supp.2d 1136, 1149 n. 20 (E.D. Cal. 2008); *see also* Robi v. Five Platters, Inc., 918 F.2d 1439 (9th Cir. 1990) (permitting summary adjudication of issues based on collateral estoppel effect of prior proceeding). Moreover, Rule 56 provides a mechanism by which plaintiff may obtain a determination in the form of an order of the court which resolves a single issue that is part of a claim for relief. Rule 56(g) provides that if a court does not render judgment upon the whole case or for all relief requested, "it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." FED. R. CIV. P. 56(g). In this way, Rule 56 allows a court to salvage some of the effort involved in ruling on a failed motion for summary judgment by resolving issues of law and fact for which a trial would not be necessary. This type of determination is perhaps more aptly called a "partial summary adjudication" than "partial summary judgment," as a means of distinguishing the relief permitted by Rule 56(g) from a final, appealable judgment. *See* 11 JAMES WM. MOORE, et al., MOORE'S FEDERAL PRACTICE § 56.40(1) (3rd ed. 2007).

Both the Bureau and the defendant intervenors treat ONRC's motion as if it seeks summary judgment on the merits of its CWA violation claim. However, ONRC does not seek summary judgment on the merits. Rather, ONRC seeks a determination as a matter of law as to

whether the undisputed facts establish certain elements of its claim, and whether certain affirmative defenses are available to the Bureau.

With regard to the elements of its claim, ONRC seeks a determination by this court that (1) the water conveyed by the Klamath Straits Drain constitutes a pollutant; (2) that the Klamath Straits Drain is a point source; (3) that the Klamath River is a navigable water; and (4) the Bureau is operating without a NPDES permit. It is undisputed that the Klamath River is a navigable water, and that the Bureau is operating the Klamath Straits Drain without a NPDES permit. However, while the parties agree that the water conveyed through the Drain *contains* pollutants, they disagree as to whether the water in the Drain is *itself* a pollutant by virtue of that fact. The parties' differing characterizations of the water conveyed through the Drain turns on their differing views of the nature of the Drain itself. On this issue, ONRC seeks a determination by the court that the Klamath Straits Drain is a "point source" as opposed to a "water of the United States." This precise issue is central to the Bureau's own motion for summary judgment and must necessarily be resolved in the course of these proceedings. Thus, as a practical matter, the objections raised by the Bureau and the defendant intervenors regarding the manner in which plaintiff presents its arguments on this issue in its own motion are largely moot. Rule 56(g) permits the court to enter relief in the nature of what plaintiff seeks: a determination as to an issue of law based on the undisputed material facts, without reaching the question of whether affirmative defenses apply.

Moreover, plaintiff challenges the Bureau's affirmative defenses of failure to state a claim by arguing that even if the Klamath Straits Drain is deemed to be a water of the United States, the Water Transfers Rule does not apply to the transfer of water from the Drain to the Klamath River because the Rule itself is invalid. ONRC further argues that this court is not, as

the Bureau contends, divested of jurisdiction to hear this argument by section 509(b)(1) of the

CWA. These arguments do not go to the merits of plaintiff's claim under the Act—that is, they

neither prove nor disprove that the Bureau is discharging pollutants into the Klamath River

without a NPDES permit. ONRC's motion merely seeks a determination on whether, as a matter

of law, these particular affirmative defenses are available to the Bureau. Therefore, the court

finds that plaintiff's motion is procedurally proper.

## DISCUSSION

The issues in this case may be summarized as follows: (1) is the Klamath Straits Drain a

"point source" or a "water of the United States" under the Clean Water Act? (2) If the Drain is a

"water of the United States," does this court have original jurisdiction to hear plaintiff's

challenge to the so-called "Water Transfers Rule," 40 C.F.R. § 122.3(i)? And, finally, (3) if so,

is the Water Transfers Rule a reasonable interpretation of an ambiguous statutory term?

## I.    The Klamath Straits Drain Is a "Water of the United States"

The Bureau argues that the Drain is a water of the United States because (1) it is an

interstate water; (2) it is a traditional navigable water and therefore a water of the United States

under the "indelible navigability" doctrine; and (3) it is a "tributary" of an undisputed water of

the United States, the Klamath River. ONRC argues that the Drain is not a water of the United

States under the "indelible navigability" doctrine because it does not lie within the historic

footprint of the Klamath Straits, and further argues that the Drain is the result of human

intervention and engineering and is therefore a point source, not a tributary of a water of the

United States.

//

//

## A. Jurisdictional "waters" under the CWA

Under the CWA, the EPA and the United States Army Corps of Engineers ("the Corps") have jurisdiction over all "navigable waters," defined in § 502(7) of the Act as all "waters of the United States." 33 U.S.C. § 1362(7). Regulations issued by both the EPA and the Corps define "waters of the United States" to include, in relevant part, "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce"; "[a]ll interstate waters including interstate wetlands"; "[a]ll other waters such as intrastate lakes, rivers, [and] streams (including intermittent streams) . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce"; and all "[t]ributaries" of any of the above. *See* 40 C.F.R. §§ 122.2, 232.2; 33 C.F.R. § 328.3(a)(1)-(4).

### 1. Interstate Waters

The Bureau argues that the Drain is a jurisdictional "water" under the CWA because it is an interstate water. The undisputed facts before the court establish that the Drain has its origin at the Stateline Highway headgates in California, and from there runs north and west into Oregon. The Drain is therefore an interstate water, which falls within the regulatory definitions of "water of the United States" promulgated by both the EPA and the Corps. Regulatory definitions notwithstanding, it is not clear that a water's status as an interstate water, standing alone, is necessarily sufficient to establish CWA jurisdiction.

While the term "navigable waters" as used in the CWA "includes something more than traditional navigable waters . . . the qualifier 'navigable' is not devoid of significance." Rapanos v. U.S., 547 U.S. 715, 731, 126 S.Ct. 2208 (2006). Moreover, Congress' authority to regulate the nation's waters is grounded in its commerce power and therefore does not depend on a water's "navigability," but on whether the water may be said to "affect" interstate commerce.

Kaiser Aetna v. U.S., 444 U.S. 164, 174, 100 S.Ct. 383 (1979) ("The cases that discuss Congress'

paramount authority to regulate waters used in interstate commerce are consequently best

understood when viewed in terms of more traditional Commerce Clause analysis than by

reference to whether the stream in fact is capable of supporting navigation or may be

characterized as "navigable water of the United States.").

The waters of the Klamath Basin, including those that flow through the Drain, have a

direct impact on interstate commerce.   The Drain is the sole means by which water used in the

Tule Lake and Lower Klamath Lake portions of the Klamath Project is returned to the Klamath

River.  The Klamath River, among other things, is subject to fishing and water treaty rights held

by the Klamath, Yurok, and Hoopa valley tribes in Oregon; is a principal source of irrigation

water for a 200,000 acre agricultural industry in southern Oregon and northern California

producing $120 million in agricultural products each year; is a major source of hydroelectric

power for both Oregon and California; and provides critical habitat for at least three species of

fish listed as "threatened" or "endangered" under the Endangered Species Act ("ESA"), 16

U.S.C. § 1531, et seq., as well as other species of fish critical to commercial fishing operations in

both Oregon and California. See generally Or. Trollers Ass'n v. Gutierrez, 452 F.3d 1104 (9th

Cir. 2006); Klamath Water Users Protective Assoc. v. Patterson, 204 F.3d 1206, 1209 (9th Cir.

1999), cert. denied, 531 U.S. 812, 121 S.Ct. 44 (2000); Klamath Irrigation Dist. v. U.S., 635 F.3d

505 (Fed. Cir. 2011); Kandra v. U.S., 145 F. Supp. 2d 1192 (D. Or. 2001); Pac. Coast Fed. of

Fishermen's Assocs. v. U.S. Bureau of Reclamation, 138 F. Supp. 2d 1228 (N.D. Cal. 2001).

The importance of the waters of the Klamath River Basin to both Oregon and California is

recognized in the Klamath River Basin Compact, acknowledged by Congress and the legislatures

of Oregon and California.  OR. REV. STAT. § 542.620 (Oregon codification of the Compact);

California Water Code §§ 5900-5901 (California codification of the Compact); Act of August 30, 1957, Pub. L. No. 85-222, 71 Stat. 497 (congressional approval). Article VII of the Klamath River Basin Compact explicitly recognizes that "cooperative action of the two states in pollution abatement and control" is necessary to ward against economic loss and threat to human health and welfare. The court therefore concludes that the Drain has an indisputable direct and significant impact on interstate commerce and is therefore a jurisdictional water under the CWA.

## 2. The "Indelible Navigability" Doctrine

The Bureau next argues the Drain is a remnant of Lower Klamath Lake and, because Lower Klamath Lake was historically navigable, the Drain is therefore a jurisdictional "water" under the CWA under the "indelible navigability" doctrine.

### Standard

The "indelible navigability" doctrine holds that once a body of water is deemed to be navigable, it remains navigable as a matter of law in perpetuity. U.S. v. Milner, 583 F.3d 1174, 1195 n. 15 (9th Cir. 2009). The doctrine derives from a line of cases decided under the Commerce Clause,[15] which held that the construction of man-made obstacles could not divest Congress of its authority to regulate an otherwise navigable waterway. See, e.g., U.S. v. Appalachian Elec. Power Co., 311 U.S. 377, 61 S.Ct. 291 (1940); Economy Light & Power Co. v. U.S., 256 U.S. 113, 41 S.Ct. 409 (1921); U.S. v. Rio Grande Dam & Irr. Co., 174 U.S. 690, 19 S.Ct. 770 (1899); Adams v. Montana Power Co., 528 F.2d 437, 440 (9th Cir. 1975). As first articulated by the Supreme Court, "navigable" for purposes of the Commerce Clause meant

---

[15] It is well established that "the power to regulate commerce necessarily includes power over navigation." Kaiser Aetna v. U.S., 444 U.S. 164, 173, 100 S.Ct. 383 (1979) (citing Gibbons v. Ogden, 22 U.S. 1, 6 L.Ed. 23 (1824); Gilman v. Philadelphia, 70 U.S. 713, 724, 18 L.Ed. 96 (1866)).

waters[16] that were navigable-in-fact, meaning the waters "are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes on water," and form by themselves or in conjunction with other waters "a continued highway over which commerce is or may be carried on with other States or foreign countries." The Daniel Ball, 77 U.S. 557, 563, 19 L.Ed. 999 (1870).

This "traditional" definition of navigability was modified by subsequent cases, which clarified that trade and travel need not be conducted by any particular type or kind of vessel because the "true criterion" of navigability is "[t]he capability of [a waterway's] use by the public for purposes of transportation and commerce . . . rather than the extent and manner of that use." U.S. v. Steamer Montello (The Montello), 87 U.S. 430, 441-42, 22 L.Ed. 391 (1874); Appalachian Elec. Power Co., 311 U.S. at 416 ("navigability" in a constitutional sense is unaffected by lack of "commercial traffic . . . where personal or private use by boats demonstrates the availability of the [waterway] for the simpler types of commercial navigation."). Moreover, trade and travel need not occur at any minimum volume because "where conditions of exploration and settlement explain the infrequency or limited nature of such use, the susceptibility to use as a highway of commerce may still be satisfactorily proved." U.S. v. Utah, 283 U.S. 64, 86-87, 51 S.Ct. 438 (1931); Appalachian Elec. Power Co., 311 U.S. at 409 (waterway need not be used continuously; it is sufficient that the water is used in a manner consistent with "[t]he character of the region, its products and the difficulties or dangers of the navigation."). Finally, navigability is not destroyed by impediments such as "occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year or at all stages of the water." Economy Light & Power, 256 U.S. at 122. An interstate waterway may be

---

[16] The standard announced in The Daniel Ball, which addressed the navigability of rivers, was made applicable to all water courses by U.S. v. Oregon, 295 U.S. 1, 14, 55 S.Ct. 610 (1935).

deemed navigable even if "reasonable improvements" are necessary to transform it from its natural condition to one suitable for interstate commerce, regardless of whether those improvements are "actually completed or even authorized." Appalachian Elec. Power Co., 311 U.S. at 407-08.

### Discussion

ONRC argues[17] the "indelible navigability" is inapplicable in this case because (1) there is insufficient evidence to show that the Klamath River, Klamath Straits, and Lower Klamath Lake supported "useful commerce," precluding the conclusion that these waters were historically navigable; (2) at the time of the Drain's construction, no navigable waters remained in the Lower Klamath Basin; and (3) the Drain does not lie entirely within the footprint of the historically navigable waters and must therefore have been navigable itself for the doctrine to apply.

#### a) The Klamath River, Klamath Straits, and Lower Klamath Lake were historically "navigable" waters

The facts establish that the native tribes were recorded as navigating across Lower Klamath Lake as early as 1846, and that early settlers traveled across the Lake as early as the 1860s. After Fort Klamath was built in 1863, the army used the Lake to transport mail, troops and supplies. The first steamboat was recorded in 1879 and, starting in 1891 and continuing through 1909, at least four steamboats operated regularly between points in the Lower Klamath Lake in California and the city of Keno on the Klamath River in Oregon while hauling up to 100 ton cargos. These trips were regular occurrences, timed to take advantage of the changing

---

[17] ONRC phrases its argument in terms of the presence or absence of a federal navigational servitude. Both the "indelible navigability" doctrine and the "navigational servitude" concept derive from the Commerce Clause. Kaiser Aetna v. U.S., 444 U.S. 164, 178, 100 S.Ct. 383 (1979); U.S. v. Certain Parcels of Land, 666 F.2d 1236 (9th Cir. 1982). However, the meaning of the term "navigability" as used in the two concepts is not coterminous. Boone v. U.S., 944 F.2d 1489, 1499 (9th Cir. 1991) (citing Kaiser Aetna, 444 U.S. at 170-73). The court therefore considers ONRC's argument and authorities only in the context of the relevant standard, that is, the scope of Congress' regulatory authority under the Commerce Clause.

seasonal currents as waters flowed back and forth between the Klamath River and Lower

Klamath Lake through the Klamath Straits. Smaller gasoline launches and steamboats operated

on these waters as well. These boats operated during a time of early settlement when the cities

were new, the local populations were small, and there was little appreciable infrastructure to

support transportation. Over a period of nearly twenty years, these boats constituted a critical

link in the transportation of both cargo and people and were regularly used until the arrival of the

railroad provided an alternative means of transportation. On these facts, the court finds that the

Klamath River, Klamath Straits, and Lower Klamath Lake were historically navigable.

### b) The circumstances of the Drain's construction do not render the "indelible navigability" doctrine inapplicable

ONRC argues that the "indelible navigability" doctrine is inapplicable in this case

because at the time the Drain was built, the Klamath Straits and nearly all of Lower Klamath

Lake had been transformed to dry land, parceled out, and sold to private citizens for agricultural

development. ONRC argues the Klamath Straits and the drained portions of Lower Klamath

Lake ceased to be navigable waters as the result of this transformation and, moreover, that

Congress abandoned its sovereign authority over those areas which were drained and

transformed to dry land. Neither argument is well taken.

### i) Congress did not abandon its sovereign authority

ONRC argues Congress' Act of February 9, 1905 ("the 1905 Act"), which authorized the

Klamath Project, must be reasonably interpreted as surrendering Congress' sovereign authority

over the waters of the Lower Klamath Basin because Congress may not logically be understood

to have retained its sovereign authority over these navigable waters while simultaneously acting

to permanently transform them to dry, fast land for parcel and sale to private citizens.

Page 26 – REPORT AND RECOMMENDATION

It is a "fundamental principle that Congress always has the power to amend, repeal or ignore legislation passed by earlier congresses." Peterson v. U.S. Dept. of Interior, 899 F.2d 799, 808 (9th Cir. 1990) (internal citations omitted).  The Supreme Court has emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148, 102 S.Ct. 894 (1982).  While the "unmistakability doctrine" has typically been invoked as a defense to a breach of contract action brought against the United States, the Supreme Court has indicated that it applies in any case where recognizing a claim against the federal government would create an exemption from the exercise of a sovereign power.  U.S. v. Winstar Corp., 518 U.S. 839, 875-79, 116 S.Ct. 2432 (1996) (interpreting U.S. v. Cherokee Nation of Okla., 480 U.S. 700, 107 S.Ct. 1487 (1987) (declining to imply a waiver of federal government's navigational easement in treaty granting fee simple title to a riverbed to the Tribe where the treaty said nothing about the government's navigational rights); Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 55, 106 S.Ct. 2390 (1986) (declining to find a contract implicitly exempted from the effects of subsequent legislation where the contract was entered into pursuant a statute which expressly reserved Congress' right to "alter, amend, or repeal" any provision of the statute; unmistakability needed for waiver of sovereign powers, not reservation of sovereign powers); Merrion, 455 U.S. at 148 (declining to imply waiver of sovereign authority to tax where contract between sovereign Tribe and private parties was silent on that issue)).  The Supreme Court has also indicated that some aspects of sovereignty may not be susceptible to waiver or surrender. Id. at 878 (citing Cherokee Nation, 480 U.S. at 707 (federal government's navigational easement

was an aspect of sovereignty and could be surrendered only in unmistakable terms "if indeed it could be waived at all")).

Here, ONRC asks the court to find that the 1905 Act binds Congress from enacting subsequent regulatory measures, and urges the court to infer this limit on the federal government's sovereign power from silence. This, the court declines to do. The 1905 Act authorizes the Secretary of the Interior to raise and lower the water level of certain named lakes including Lower Klamath Lake and dispose of the lands underneath "in carrying out any irrigation project that may be undertaken by [the Secretary] under the terms and conditions of the national reclamation Act." Thus, the 1905 Act merely authorizes certain irrigation projects pursuant to the National Reclamation Act of 1902 ("the Reclamation Act of 1902"). The Reclamation Act of 1902 was enacted to promote agriculture pursuant to Congress' power to manage and dispose of federal property and to promote the general welfare. Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 294, 78 S.Ct. 1174 (1958) (*citing* U.S. CONST., art. I, § 8, cl. 1 & art. IV, § 3). "[T]he Reclamation Act of 1902 was animated by three primary goals: 'to create family-sized farms in areas irrigated by federal projects . . . , to secure the wide distribution of the substantial subsidy involved in reclamation projects and [to] limit private speculative gains resulting from the existence of such projects.'" Peterson, 899 F.2d at 803 (*quoting* U.S. v. Tulare Lake Canal Co., 535 F.2d 1093, 1119 (9th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1156 (1977)). Congress intended the Reclamation Act of 1902 to function as blueprint for achieving these goals and used water as the tool for effectuating those purposes "by limiting the quantity of land in a single ownership to which project water might be supplied." Id. at 802-03 (*quoting* Ivanhoe, 357 U.S. at 292).

Page 28 – REPORT AND RECOMMENDATION

Thus, both the 1905 Act or the Reclamation Act of 1902 are silent with respect to

Congress' commerce power. There is no implication that either Act was intended to waive

Congress' sovereign authority to regulate the waters in the Lower Klamath Basin. The

presumption that this silence is deliberate is consistent with the terms of the 1907 contract

between the Bureau's predecessor (the Reclamation Service) and the California Northeastern

Railway, which obligated the United States to assume all responsibility for interruptions to

navigation due to the fact that the 1905 Act authorized the Secretary of the Interior to raise or

lower the water level of Lower Klamath Lake without expressly closing the Lake to navigation.

Additional evidence is found in the Bureau's 1975 Final Environmental Statement regarding the

proposed expansion of the Drain, in which the Bureau reported that the Drain was subject to the

CWA's NPDES permitting requirements. (*See* Birri Decl., Ex. 4, pp. 81).

### ii)  The Drain's construction on dry reclaimed land does not preclude application of the "indelible navigability" doctrine

ONRC argues that the indelible navigability doctrine does not apply in this case because

at the time the Drain was constructed, the Klamath Straits and Lower Klamath Lake had been

drained of all water and converted to dry upland for more than twenty years. Implicit in this

argument is the assumption those portions of a historically navigable water which are drained of

water lose their navigable status, and only those portions which remain covered by water retain

their navigable status. In support of this argument ONRC offers James River v. Richmond

Metro. Auth., 359 F.Supp. 611 (E.D. Va. 1973), Leslie Salt Co. v. Froehlke, 578 F.2d 742 (9th

Cir. 1978), and U.S. v. Milner, 583 F.3d 1174 (9th Cir. 2009).

ONRC relies heavily on James River, which involved a challenge to a proposed

expressway into downtown Richmond, Virginia. The plaintiffs in James River argued the

project was subject to the permitting requirements of the Rivers and Harbors Act of 1899

Page 29 – REPORT AND RECOMMENDATION

("RHA") because the construction of the expressway would result cuts and ruptures to the walls

of a canal. 359 F.Supp. 621-22. The canal, which had been built between 1785 and 1854 and

filled with dirt in 1880, was covered by a parking lot at the time of the court's decision. Id. at

621. The plaintiffs, relying on Appalachian Electric Power, argued that although the canal had

been filled and was not currently navigable, it was still a "water of the United States" within the

meaning of the RHA. Id. at 640. The court acknowledged the "indelible navigability" doctrine

as established by Appalachian Electric Power and Economy Light & Power, but nevertheless

granted summary judgment in favor of the defendants. Id. at 640. In so holding, the court found

that the canal had been drained, filled and abandoned before the RHA was enacted and was

presently still drained and filled, and concluded that the canal had simply ceased to exist as a

waterway. Id. The court distinguished the facts of the case before it from Economy Light &

Power and Appalachian Electric Power on grounds that the waters in those cases "continued to

exist as rivers but [became] obsolete for navigation," whereas the canal did not flow and could

not be made navigable by mere improvement, but would instead "have to be entirely

reconstructed, including the addition of a most necessary element—water." Id.

ONRC argues this case is analogous to James River because, like the canal, the Klamath

Straits and Lower Klamath Lake had been completely drained and converted to dry land,

therefore the construction of the Drain did not entail a mere improvement to an existing water

but instead required a complete reconstruction, which involved extensive dredging, excavation

and the addition of water. ONRC apparently overlooks the critical distinction between James

River and the case at bar. In James River, the land which had once been submerged had been

transformed entirely to dry land and the possibility that the water would or could be restored was

merely theoretical. Here, by contrast, although most of the lands which were once submerged

Page 30 – REPORT AND RECOMMENDATION

remain dry land, water has actually overtaken and flows over a portion of those lands, re-submerging them. James River implicitly acknowledged that, had the canal actually been excavated and refilled with water at the time of the court's decision, it may have been a "water of the United States" under the RHA. That is exactly the situation which this court is confronted with: the restoration has already been completed, and a remnant of historically navigable water actually flows across the once-submerged lands. James River is therefore inapposite.

Nor do Leslie Salt or Milner support ONRC's argument. Both Leslie Salt and Milner involved disputes related to lands subject to tidal inundations, and in particular the determination of the proper boundary of the Corps' jurisdiction under the RHA and CWA. Taken together, Leslie Salt and Milner hold that waters which were historically navigable in their natural condition but which had been transformed to dry, solid upland at the time the CWA was enacted are not subject to CWA jurisdiction, Leslie Salt, 578 F.2d at 754, until or unless water actually overtakes the land, Milner, 583 F.3d at 1195. These holdings do not change the indelible navigability doctrine. Milner, 583 F.3d at 1195 n. 15. Therefore, the CWA extends at least to the remnants of waters which were historically navigable but which have been rendered non-navigable as the result of artificial obstructions. Leslie Salt, 578 F.2d at 756.

In James River, the canal had been drained, filled, and converted to dry land prior to the enactment of the RHA and had remained dry land at all times thereafter. Here, the Drain was first constructed and flooded in 1945, three years before the CWA was first enacted. See Act of June 30, 1948, 62 Stat. 1155, codified at 33 U.S.C. § 11151, et seq. (prior to the 1972 Amendments). Under Leslie Salt, the lands which were submerged by the initial construction of the Drain fall under the jurisdiction of the CWA and, under Milner, the lands that were dry, solid upland at the time the CWA was enacted but which were subsequently re-flooded when the

Page 31 – REPORT AND RECOMMENDATION

Drain was expanded in 1976 also fall under the jurisdiction of the CWA, at least to the extent

that the Drain was constructed within the footprint of the historically navigable Klamath Straits

and Lower Klamath Lake. ONRC's argument that the "indelible navigability" doctrine is

inapplicable because the Drain was constructed over dry upland is therefore rejected.

### c) The Drain's departure from the historic footprint of the Klamath Straits does not preclude application of the "indelible navigability" doctrine

ONRC argues the "indelible navigability" doctrine is inapplicable because the Drain

does not lie entirely within the historic footprint of the Klamath Straits. Although the Drain lies

partly within the historic footprint of the Straits, it does not exactly mirror the historic footprint

of the Straits and, in particular, does not follow the Straits' historic footprint to its point of

confluence with Lower Klamath Lake but rather cuts across what would historically have been

an expanse of marshland. This deviation appears form the basis of ONRC's objection.

The Drain proceeds from its point of origin in California in a straight, channelized path

first north and then northwest across what would historically have been an open expanse of

Lower Klamath Lake, then turns and cuts straight north across what would historically have been

an expanse of marshlands between the Lake and the Klamath Straits, before finally turning at a

point coinciding with the historic Klamath Straits and proceeding northwest to the Klamath

River in a path generally consistent with the Strait's historic footprint. (*See* Decl. of Michael J.

Neuman ("Neuman Decl."), Ex. 1). As the result of cutting across what would historically have

been marshlands, the Drain intersects with the historic footprint of the Klamath Straits at a point

approximately one and a half miles northwest of where the historic point of confluence between

the Straits and Lower Klamath Lake. The Bureau argues that this deviation is irrelevant because

the Drain as a whole lies in its entirety within Lower Klamath Lake's historic footprint, therefore

the Klamath Straits were not a separate water body, but rather were "simply an area of open

water in Lower Klamath Lake." (Def's Reply in Supp. of Summ. J., Dckt. #233, pp. 10-11).

This argument asserts a conclusion beyond the established facts.

The facts establish that, absent the annual flooding of the Klamath River, Lower Klamath

Lake lay nestled in the center of the Lower Klamath Basin surrounded on all sides by some

40,000 acres or so of swampy marshland. During the annual flooding of the Klamath River,

water would flow over the marshlands to fill the entire Lower Klamath Basin, creating an open

expanse of water and marsh. The Bureau argues that because the marshlands surrounding Lower

Klamath Lake were subject to annual flooding by the overflow from the Klamath River, they are

indistinguishable from and must be considered a part of the lake itself. In other words, the

Bureau asserts that Lower Klamath Lake was historically coextensive with the Lower Klamath

Basin, therefore the entirety of the Lower Klamath Basin is navigable as a matter of law under

the "indelible navigability" doctrine. This argument is unpersuasive.

While the exact boundary between Lower Klamath Lake and the surrounding marshlands

may have been constantly in flux due to seasonal flooding and precipitation, this does not

mandate the conclusion that the marshlands are indistinguishable from and must therefore be

considered part of Lower Klamath Lake. The contemporary maps submitted by the parties do

not characterize the Basin in this manner; rather, they consistently show Lower Klamath Lake as

lying in the middle of the Basin and surrounded on all sides by tens of thousands of acres of

marshland. Under regulations promulgated by both the EPA and the Corps, marshes are

synonymous with "wetlands," defined as:

> "those areas that are inundated or saturated by surface or groundwater at a
> frequency and duration sufficient to support, and that under normal circumstances
> do support, a prevalence of vegetation typically adapted for life in saturated soil

conditions. Wetlands generally include swamps, marshes, bogs, and similar areas."

40 C.F.R. §§ 122.2, 232.2; 33 C.F.R. § 328.3(b); *see also* WEBSTER'S NEW WORLD DICTIONARY

869, 1616 (2nd College ed. 1978) (defining "wetland" as "swamps or marshes," and "marsh" as

"a tract of low, wet, soft land; swamp, bog, morass, fen."). The historical use of the term

"marshland" to describe the 40,000 acres or so surrounding Lower Klamath Lake implies that

these areas were soft, wet land, not an expanse of navigable water, and the facts before the court

do not suggest otherwise. There is no evidence that boats of any kind navigated through the

marshlands. Indeed, the historical records consistently specify that boats navigating between the

Klamath River and Lower Klamath Lake made the trip through the Klamath Straits. Moreover,

these trips were precisely timed to take advantage of the seasonal currents, indicating that even in

times of high floodwaters the only navigable path through the marshlands was the Klamath

Straits.

　　At most, the evidence suggests that as the result of the seasonal flooding of the Klamath

River, water would flow over the marshlands at an undetermined depth and for an indeterminate

period of time. In short, whether and to what extent the marshlands surrounding Lower Klamath

Lake were historically navigable is not established by the facts before the court. On these facts,

the court declines to find that the marshlands ceased to be a marsh and became part of a Lower

Klamath Lake, or that the Klamath Straits were merely an open expanse of water within the lake.

Instead, the facts suggest that the Klamath Straits functioned as a tributary, connecting the

Klamath River and Lower Klamath Lake. This does not preclude a later determination to the

contrary, should the facts necessary to support such a conclusion be submitted. However, for the

purposes of this opinion and on the facts submitted, such a conclusion is unwarranted.

Regardless, the court finds ONRC's argument that the "indelible navigability" doctrine is inapplicable to the Drain by virtue of the fact that the Drain does not exactly mirror the historic point of confluence between the Klamath Straits and Lower Klamath Lake to be artificially and unnecessarily restrictive. The marshlands surrounding Lower Klamath Lake were susceptible to navigation with improvements. In fact, navigation to Lairds Landing at the far southern point of Lower Klamath Lake and between Lower Klamath Lake and White Lake was made possible by channels cut through the marsh by a dredger. Because the marshlands were themselves susceptible to navigation with reasonable improvements, they are "navigable." Appalachian Elec. Power Co., 311 U.S. at 407-08.

The fact is that the Drain, like the Klamath Straits, creates a hydrological connection between the Klamath River and Lower Klamath Lake. While it appears likely that upstream diversions have significantly impacted the water levels of the Klamath River, it nevertheless appears that if the Klamath River and Stateline Highway headgates were removed and the E/EE and F/FF pumping stations were taken out, it would be possible for water to flow between the Klamath River to Lower Klamath Lake, thereby enabling navigation between the river and the lake. As manmade obstructions do not defeat navigability, Economy Light & Power, 256 U.S. at 122, the navigability of the Drain is unaffected by the presence of either the headgates or the pumps. For these reasons, the court concludes that the "indelible navigability" doctrine is not rendered inapplicable by virtue of the Drain's deviation from the exact footprint of the historic Klamath Straits and Lower Klamath Lake.

## Conclusion

For the reasons stated above, the Klamath Straits Drain is a jurisdictional water under the CWA under the "indelible navigability" doctrine.

Page 35 – REPORT AND RECOMMENDATION

### 3. Tributaries to "Navigable Water"

Finally, the Bureau argues the Drain is a jurisdictional "water" under the CWA because it is a tributary of a traditional navigable water, the Klamath River. ONRC counters that even if the Drain may be deemed a "tributary" of a navigable water, this does not preclude the determination that it is also a "point source" as that term is defined by the Act; therefore, the Drain's status as a "tributary" does not exempt it from NPDES permitting requirements.

### **Standard**

Both the EPA and the Corps have defined "waters of the United States" to include both traditional navigable waters and non-navigable tributaries of such waters. 40 C.F.R. § 122.2; 33 C.F.R. § 328.3(a)(5). The Ninth Circuit has approved of this inclusion. U.S. v. Moses, 496 F.3d 984, 989 n. 8 (9th Cir. 2007) ("There can be little doubt that a tributary of waters of the United States is itself a water of the United States"). While the term "tributaries" is not itself defined in the regulations promulgated by either the EPA or the Corps, the EPA has defined the term in an internal guidance memorandum to mean "a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly by means of other tributaries." *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States* (EPA Guidance Memo), December 2, 2008, *available at* http://www.epa.gov/owow/wetlands/pdf/CWA_Jurisdiction_Following_Rapanos120208.pdf.

The EPA Guidance Memo was issued following the Supreme Court's 4-4-1 decision in Rapanos v. United States, where the issue was whether isolated wetlands located "near ditches or man-made drains that eventually empty into traditional navigable waters" were within the scope of the Corps' jurisdiction to require dredge and fill permits under Section 404 of the CWA, 33 U.S.C. § 1344. 547 U.S. 715, 729, 126 S.Ct. 2208 (2006). Citing the Court's precedential

holdings in Solid Waste Agency of N. Cook Cnty. v. Army Corps of Engrs., 531 U.S. 159, 121

S.Ct. 675 (2001) (SWANCC) and U.S. v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106

S.Ct. 455 (1985), all of the Justices agreed that the term "navigable waters" encompasses some

waters that are not navigable in the traditional sense, meaning navigable-in-fact. *See* Rapanos,

547 U.S. at 730-31 (plurality opinion); id. at 767-68 (Kennedy, J., concurring in the judgment);

id. at 787 (Stevens, J., dissenting).  However, while both the plurality and Justice Kennedy

agreed that the term "navigable" is not insignificant and should not be disregarded, id. at 731

(plurality opinion); id. at 778 (Kennedy, J., concurring in judgment), they disagreed on how to

give the term meaning, and therefore articulated different tests.

　　　Where a fragmented Supreme Court decides a case and no opinion commands a majority,

"'the holding of the Court may be viewed as that position taken by those Members who

concurred in the judgments on the narrowest grounds.'" Dickens v. Brewer, 631 F.3d 1139,

1145 (9th Cir. 2011) (*quoting* Marks v. U.S., 430 U.S. 188, 193-94, 97 S.Ct. 990 (1977)).  The

Court has expressly permitted lower courts to apply a similar analysis. Benjamin v. Douglas

Ridge Rifle Club, 673 F.Supp.2d 1210, 1216 (D. Or. 2009) (*citing* Moses H. Cone Mem. Hosp.

v. Mercury Contr. Corp., 460 U.S. 1, 17, 103 S.Ct. 927 (1983)).  Although it found the plurality's

test to be unduly restrictive and Justice Kennedy's test to be unnecessarily burdensome, the

dissent in Rapanos clearly stated it would find jurisdiction under the CWA when either test was

satisfied. 547 U.S. at 810 & n. 14 (Stevens, J., dissenting).  Because both the plurality and

Justice Kennedy's concurrence are therefore narrower than the dissent and either would

command a majority of the court, both tests constitute a controlling rule of law.[18]  Benjamin, 673

F.Supp.2d at 1216.

---

[18] The Ninth Circuit at one time declared Justice Kennedy's concurring opinion to be the
"controlling rule of law," it subsequently amended its holding to clarify that "Justice Kennedy's

The Rapanos plurality opined that the term "navigable" must at a minimum be read to require "the ordinary presence of water." 547 U.S. at 734.  Therefore, in order to be "water of the United States" subject to regulation under the CWA, the plurality held that a non-navigable tributary must be "relatively permanent" and a wetland must have "a continuous surface connection" with either a traditionally navigable water or non-navigable tributary thereof. Id. at 732. The plurality defined "relatively permanent" as "connot[ing] continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows," yet carefully avoided *per se* excluding waters which might run dry due to extraordinary circumstances or seasonal water cycles. Id. at 733 & n. 5.

Justice Kennedy opined that the term "navigable" requires that both tributaries and wetlands have a "significant nexus" with a navigable-in-fact water. Id. at 781-82.  He expressly rejected the plurality's test as inconsistent with the text, structure, and purpose of the Act both with regard to the "relatively permanent" requirement for tributaries and the "continuous surface connection" requirement for wetlands. Id. at 776.  With regard to tributaries, Justice Kennedy found the "relatively permanent" requirement to be nonsensical in light of the Act's concern with "downstream water quality" and Congress' failure to "exclude irregular waterways." Id. at 769. Instead, Justice Kennedy found that by requiring that tributaries feed into a traditional navigable water or tributary thereof and possess an ordinary high-water mark, the Corps' standard "may well provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute 'navigable waters' under the Act." Id. at 781. However, Justice Kennedy also rejected the dissent's contention that a wetland's mere adjacency

---

concurrence provides the controlling rule of law *for our case*." N. Cal. River Watch v. City of Healdsburg, 457 F.3d 1023, 1029 (9th Cir. 2006), *as amended by* 496 F.3d 993, 999-1000 (9th Cir. 2007) (emphasis added).  The Ninth Circuit recently reaffirmed that it has not foreclosed the possibility that CWA jurisdiction may be established under Rapanos' plurality standard. N. Cal. River Watch v. Wilcox, 633 F.3d 766, 781 (9th Cir. 2011).

to tributaries, however remote and insubstantial, is sufficient to confer jurisdiction under the CWA because this approach "seems to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." Id. at 781. Therefore, under Justice Kennedy's test, a wetland adjacent to navigable-in-fact water is a jurisdictional water under the CWA while jurisdiction based on adjacency to non-navigable tributaries must be established on a case-by-case basis. Id. at 781-82.

### Discussion

The Bureau argues that because the Drain contains water year-round and contributes water to the Klamath River nearly every day of the year, it is a "tributary" of the Klamath River under either the "relatively permanent" test or the "significant nexus" test. The court agrees.

The undisputed evidence shows that the Drain has a defined bed and bank, established minimum and maximum water levels, and that the flow of water through the Drain is perennial and substantial. Daily operating records show that, averaged over the past twenty-four years, the "E/EE" and "F/FF" pumping stations have been active more than 93% of the time, contributing a recorded minimum daily flow rate of 8 acre feet ("AF") (2.6 million gallons), a maximum daily flow rate of 594 AF (193.6 million gallons), and an average daily flow rate of 197 AF (64.2 million gallons). This evidence is sufficient to support a finding that the Drain is a "relatively permanent" tributary of a navigable water, and therefore itself a "water of the United States."

This holding is consistent with both Ninth Circuit authority. As interpreted by the Ninth Circuit, a "tributary" is a "stream which contributes its flow to a larger stream or other body of water." Cmty. Ass'n for Restoration of the Envt. v. Henry Bosma Dairy, 305 F.3d 943, 954 (9th Cir. 2002) (citing Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526, 533 (9th Cir. 2001)). Even before Rapanos, the Ninth Circuit took the position that "when the question is whether a

water is properly classified as a 'tributary' subject to [CWA] jurisdiction, that water must exchange water, at least intermittently, with a water of the United States." <u>Baccarat Freemont Developers, LLC v. U.S. Army Corps of Eng'rs</u>, 425 F.3d 1150, 1156 (9th Cir. 2005) (*interpreting* <u>Headwaters, Inc.</u>). The Ninth Circuit has affirmed that this approach remains valid in the wake of <u>Rapanos</u>. <u>Moses</u>, 496 F.3d at 988-991 (tributary of navigable water which was rendered dry except for two months of the year due to upstream irrigation diversion structure remained a "water of the United States"). District courts within the Ninth Circuit have reached the same conclusion. *See* <u>U.S. v. Vierstra</u>, -- F.Supp.2d --, --, 2011 WL 1064526 (D. Idaho 2011) (intrastate irrigation canal containing water six to eight months a year which discharged directly into navigable water was a "tributary" under both the "relatively permanent" and "significant nexus" tests). The court therefore has no difficulty concluding that the Drain, which contains water throughout its length year round and contributes millions of gallons of water to the Klamath River nearly every day is a "tributary" under the <u>Rapanos</u> plurality's "relatively permanent" test.

Likewise, the court finds that the Drain is a "tributary" under Justice Kennedy's "significant nexus" test. As described above, Justice Kennedy expressed concern mainly with respect to determining whether remote, isolated, and minor tributaries should be deemed "tributaries." In the context of "minor tributaries," he took a more lenient approach than the plurality, rejecting the plurality's "relatively permanent" test as overly restrictive and suggesting that the Corps' standard, requiring that the water possess an ordinary high-water mark and feed into a traditional navigable water or a tributary thereof, would be sufficient to demonstrate that a "significant nexus." The Drain unquestionably satisfies this standard: it feeds into the Klamath River, a traditional navigable water, and possesses an ordinary high-water mark. Moreover,

because the court has found that the Drain satisfies the plurality's "relatively permanent" standard, it logically follows that the Drain also satisfies Justice Kennedy's more lenient "significant nexus" standard. Common sense also mandates this result. There can be no reasonable argument that the Drain, which contributes millions of gallons of water a day to the Klamath River, lacks a sufficiently "significant nexus" with the River.

The fact that the Drain is man-made does not preclude the finding that it is also a "tributary" and therefore a "water of the United States." The Ninth Circuit had held, more than once, that man-made conveyances, including irrigation canals, may be "tributaries" of a navigable water. Henry Bosma Dairy, 305 F.3d at 954-55 (9th Cir. 2002) (irrigation canal that diverted water from a navigable river in the spring and back to the river in the fall properly deemed a tributary); Headwaters, Inc., 243 F.3d at 533 (irrigation canals which received water from natural streams and lakes and diverted water to streams and creeks were tributaries of "waters of the United States"). Rapanos does not alter the validity of this analysis. Although the plurality's opinion stated that the statutory definitions at play "conceiv[ed] of 'point sources' and 'navigable waters' as separate and distinct categories," it qualified that statement by noting that the statute "would make little sense if the two categories were *significantly* overlapping." Rapanos, 547 U.S. at 735 (emphasis added). From the plurality's perspective, the relevant question is not whether a given body of water is man-made or naturally occurring, but whether the water body is characterized by the ordinary presence of water. Id. at 735-36 & n. 7 (analyzing the terms used in the Act's definition of "point source" in terms of whether they connote the ordinary presence of water and noting that the "relatively continuous flow is a *necessary* condition for qualification as a 'water,' not an *adequate* condition") (emphasis in original). While the plurality opinion suggests that it is unlikely that a "point source" can also be

a "water of the United States," it stops short of concluding that the terms are mutually exclusive. *See* Nat'l Assoc. of Home Builders v. U.S. Army Corps of Engr's, 699 F.Supp.2d 209, 215-16 (D. D.C. 2010) (reaching same result). Justice Kennedy's opinion, on the other hand, expressly recognizes the possibility that "certain water-bodies could conceivably constitute both a point source and a water." Id. at 772. Therefore, neither the Rapanos plurality's opinion nor Justice Kennedy's opinion support the conclusion that the Drain cannot be a "water of the United States" or a tributary thereof by virtue of the fact that it also satisfies the Act's definition of a "point source."

Likewise, it is irrelevant that the water in the Drain only reaches the Klamath River as the result of human engineering. District courts within the Ninth Circuit have consistently rejected the notion that whether a water is a "tributary" depends on whether it reaches a traditionally navigable water by means of "natural" or "artificial" flow. *See* U.S. v. Adam Bros Farming, Inc., 369 F.Supp.2d 1166, 1176-77 (C.D.Cal. 2003); Cal. Sportfishing Prot. Alliance v. Diablo Grande, Inc., 209 F.Supp.2d 1059, 1075-76 (E.D.Cal. 2002) (creek which reached a navigable water via an underground tunnel deemed to be a tributary); U.S. v. New Portland Meadows, Inc., Civ. No. 00-507-AS, 2002 WL 31180956 at * 6-7 (D. Or. 2002) (ditch which contributed water to navigable river only as the result of forced pumping deemed to be a tributary). Again, nothing about either the Rapanos plurality's opinion or Justice Kennedy's opinion mandates a different result.

## **Conclusion**

For the reasons stated above, the court finds that the Drain is a "water of the United States" and therefore a "navigable water" within the meaning of the CWA (1) as an interstate

water, (2) under the "indelible navigability" doctrine, and (3) as a "tributary" of a navigable water.

## II.  The Court Has Jurisdiction to Hear ONRC's Challenge to the Water Transfers Rule

ONRC argues the Water Transfers Rule is not authorized by the CWA and is thus an *ultra vires* act which may properly be challenged in federal district court under the general federal question statute, 28 U.S.C. § 1331.  The Bureau responds that this court is divested of federal question jurisdiction by section 509(b)(1) of the CWA, 33 U.S.C. § 1369(b)(1).

### Standard

Read in conjunction with the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the CWA "creates a bifurcated jurisdictional scheme in which jurisdiction over certain claims against EPA is vested exclusively in the circuit courts, and the remainder are vested in the district courts." Envtl. Prot. Info. Ctr. v. Pacific Lumber Co. ("EPIC"), 266 F.Supp.2d 1101, 1109 (N.D. Cal. 2003) (*citing* 33 U.S.C. §§ 1365(a), 1369(b)(1)).  Section 509(b)(1) identifies seven categories of agency actions over which the circuit courts of appeal enjoy original jurisdiction. 33 U.S.C. § 1369(b)(1).  These agency actions may not be challenged through enforcement actions brought in a federal district court. 33 U.S.C. § 1369(b)(2).  The Ninth Circuit has made explicit that section 509(b)(1) is to be narrowly construed. *See* NW. Envtl. Advocates v. U.S. Envtl. Prot. Agency ("NW Environmental Advocates"), 537 F.3d 1006, 1015 (9th Cir. 2008) (*citing* League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren, 309 F.3d 1181, 1190 n. 8 (9th Cir. 2002)).  Other than as specified by section 509(b)(1), challenges to EPA actions may be brought in federal district court under the Act's citizen suit provision, section 505(a), or as APA claims based on general federal question jurisdiction. EPIC, 266 F.Supp.2d at 1109.

The Bureau argues that the Water Transfer Rule falls under either section 509(b)(1)(E)

(effluent limitations) or section 509(b)(1)(F) (issuing or denying of permits) of the Act,[19]

therefore review of the Water Transfers Rule is available exclusively in the federal circuit courts

of appeal. The court reviews the merits of this claim with respect to each subsection, below.

### A. Section 509(b)(1)(E)

Section 509(b)(1)(E) commits challenges to actions by the EPA Administrator

"approving or promulgating any effluent limitation or other limitation under section 1311, 1312,

1316, or 1345 of this title" to the original jurisdiction of the circuit courts. *See* 33 U.S.C. §

1369(b)(1)(E) (referring to sections 301, 302, 306, and 405 of the CWA). "Effluent limitation"

is defined by the Act and by EPA regulations as "any restriction on quantities, rates, and

concentrations of chemical, physical, biological, and other constituents which are discharged

from point sources...." 33 U.S.C. § 1362(11); 40 C.F.R. § 122.2.

The Bureau argues that while the Water Transfer Rule is not itself an "effluent

limitation," it represents a policy decision regarding the scope and limits of the NPDES

permitting system, and is therefore an "other limitation" within the meaning of section

509(b)(1)(E) as that term has been interpreted by the Ninth Circuit and other jurisdictions.

ONRC responds that instead of imposing limitations on the discharge of pollutants, the Water

Transfer Rule creates a categorical and permanent exemption for activities subject to the NPDES

permitting system and therefore does not fall within the scope of section 509(b)(1)(E) under

controlling Ninth Circuit precedent.

As interpreted by the Ninth Circuit, "[s]ection 509(b)(1)(E) authorizes original court of

appeals jurisdiction for challenges to regulations that establish numerical limitations and similar

limits." NW Envtl. Advocates, 537 F.3d at 1015. In NW Environmental Advocates, the plaintiff

---

[19] 33 U.S.C. §§ 1369(b)(1)(E) and (F), respectively.

challenged EPA regulations that created exemptions for certain types of marine vessel discharges. Id. at 1012-13. In finding that the challenged regulation did not fall within the ambit of section 509(b)(1)(E), the Ninth Circuit contrasted and distinguished Natural Resources Defense Council v. U.S. Environmental Protection Agency ("NRDC D.C. Cir.") 673 F.2d 400 (D.C. Cir. 1982). Id. at 1015-16. Whereas the D.C. Circuit Court of Appeals had faced a challenge to regulations creating a complex set of procedures that imposed limitations on point sources and permit issuers by restricting eligibility for certain provisions and setting guidelines for the numerical limitations in permits, the Ninth Circuit found that the challenged regulations before it created "categorical and permanent exemptions . . . from any limit imposed by a permitting requirement" for three particular types of discharges. Id. The Ninth Circuit held this type of categorical exclusion "may only be characterized as 'approving or promulgating any effluent limitation or other limitation' if those words are understood in a Pickwickian sense" – that is, if the words are not given their literal meaning. Id. at 1016.

The Bureau argues that the Water Transfer Rule is analogous to the regulations at issue in NRDC D.C. Cir.. This court cannot agree. The Water Transfer Rule does not create procedures restricting the availability of certain provisions, nor does in any way guide the setting of numerical limitations in permits. In formulating the rule, the EPA expressly considered, invited comment on, and ultimately declined to incorporate "an option that would provide an additional provision allowing the NPDES authority to designate particular water transfers as subject to NPDES permit requirements on a case-by-case basis." NPDES Water Transfers Rule, 73 Fed. Reg. at 33,706. Instead, the EPA formulated the Water Transfers Rule in a manner consistent with its interpretation of the CWA as categorically excluding water transfers from the NPDES permitting system. Id. As promulgated, the Water Transfers Rule creates a blanket exemption

applicable to all activities conveying or transferring water from one water of the United States to another, without regard for what pollutants are or are not contained in the transferred (donor) water. The Water Transfer Rule is thus analogous to the regulation challenged in <u>NW Environmental Advocates</u>. Accordingly, section 509(b)(1)(E) does not apply to deprive this court of jurisdiction to hear plaintiff's challenge.

### B. Section 509(b)(1)(F)

Section 509(b)(1)(F) commits challenges to actions by the EPA Administrator "in issuing or denying any permit under section 1342 of this title" to the original jurisdiction of the circuit courts. *See* 33 U.S.C. § 1369(b)(1)(F) (referring to section 402 of the CWA).

The Bureau argues that the Water Transfer Rule falls within section 509(b)(1)(F) because it "implements the NPDES permitting program by distinguishing between the types of water movements through point sources" to establish those that require NPDES permits, and those that do not. (Def's Resp. to Pl's Mot for Partial Summ. J., pp. 14, 16). In other words, the Bureau argues the Rule is "'functionally similar' to the issuance or denial of a NPDES permit" and therefore reviewable only in the circuit courts of appeal under <u>Crown Simpson Pulp Co. v. Costle</u>, 445 U.S. 193, 196, 100 S.Ct. 1093 (1980) and subsequent Ninth Circuit cases. Plaintiff counters that the controlling Ninth Circuit precedent applicable here is <u>NW Environmental Advocates</u>, which distinguished <u>Crown Simpson</u> and each of the Ninth Circuit cases on which the Bureau relies.

In <u>NW Environmental Advocates</u>, the plaintiff challenged the validity of 40 C.F.R. § 122.3(a), an EPA regulation promulgated in 1973 which exempted marine engine discharges, graywater discharges, and other discharges "incidental to the normal operation of a vessel,"

including ballast water, from NPDES permitting requirements.[20] 537 F.3d at 1011. After the

EPA denied the plaintiff's petition for repeal of the regulation, the plaintiff filed suit under 5

U.S.C. § 706(c)(2) arguing that the exemptions created by the regulation were not authorized by

the CWA and thus *ultra vires*, therefore the EPA's denial of its petition for repeal of the

regulation was "not in accordance with the law." Id. at 1014. The district court vacated the

challenged portion of the regulation and the EPA appealed, arguing in relevant part that section

509(b)(1)(F) divested the district court of subject matter jurisdiction to hear the plaintiff's suit.

Id. at 1014-15.

On appeal, the Ninth Circuit reviewed two of its prior decisions where it exercised

original jurisdiction under section 509(b)(1)(F) and the Crown Simpson "functionally similar"

standard: Natural Resources Defense Council v. U.S. EPA ("NRDC 9th Cir. 1992"), 966 F.2d

1292 (9th Cir. 1992), and Natural Resources Defense Council v. U.S. EPA ("NRDC 9th Cir.

2008"), 526 F.3d 591 (9th Cir. 2008). The Ninth Circuit noted that in both cases, it exercised

jurisdiction under 509(b)(1)(F) because the challenged EPA regulations merely "sought to define

more precisely" the types of discharges encompassed by exemptions explicitly created by the

CWA. NW Envtl. Advocates, 537 F.3d at 1017-18. By contrast, no statutory provision

explicitly provided the underlying exemption for the challenged vessel discharge regulation

before it, thus the regulation created new categories of exempted discharges rather than

clarifying the extent and scope of existing statutory exemptions. Id. at 1018.

The Ninth Circuit analogized the facts of the case before it to Environmental Protection

Information Center v. Pacific Lumber Co. ("EPIC"), 266 F.Supp.2d 1101 (N.D. Cal. 2003).

---

[20] The regulation also provided that the discharge of sewage did not require a NPDES permit.
Because sewage discharges were expressly exempted by the Act itself, the Ninth Circuit found
that the regulation did not create an exemption for this kind of discharge "but instead merely
recognizes the statute's exemption." NW Envtl. Advocates, 537 F.3d at 1011.

EPIC addressed a challenge to an EPA regulation that "permanently exempted an entire class of silvicultural discharges from any NPDES permitting requirement." 266 F.Supp.2d at 1108-09. The challenged regulation in that case was not based on an exemption created by an express provision of the CWA; it was promulgated pursuant to the EPA's general rulemaking authority under section 501 of the Act. Id. at 1111-12. The district court rejected the EPA's argument that original jurisdiction to review the regulation was committed to the circuit courts by section 509(b)(1)(F), reasoning that the challenged regulation "is properly characterized as a regulation identifying a class of silvicultural sources that do not require NPDES permits." Id. at 1113. Because the regulation eliminated these sources from the NPDES requirements, it was not the "functional equivalent" of a rule regulating permitting. Id. at 1114-15. The district court distinguished NRDC 9th Cir. 1992 and NRDC D.C. Cir., noting that in both cases, the challenged regulation governed some aspect of a regulatory scheme imposed on certain sources of pollutants. Id. By contrast, the challenged regulation before the district court "excludes sources from the NPDES program [such that] circuit courts will never have to confront the issuance or denial of a permit for these sources." Id. at 1115. Assuming jurisdiction over the challenged regulation therefore would not lead to the same awkward situation perceived in NRDC 9th Cir. 1992 and NRDC D.C. Cir., where the circuit court would have the authority to review the issuance or denial of a permit, but would never be able to review directly the underlying regulation. Id. at 1116.

Here, as in EPIC and NW Envtl. Advocates, the challenged regulation permanently excludes a particular kind of discharge from the NPDES program. As in EPIC and NW Envtl. Advocates, the Rule was not based on an exemption created by express provision of the Act, but rather was promulgated by the EPA pursuant to its general rulemaking authority. The Bureau

attempts to analogize the Water Transfers Rule to the challenged regulations in <u>NRDC 9th Cir.</u>

<u>1992</u> and <u>NRDC 9th Cir. 2008</u> by arguing that the Rule "defines more precisely those discharges

that do, and do not, constitute 'additions'" as that term is interpreted by the EPA. This analogy

is not persuasive. The CWA does not contain any statutory provision exempting discharges of

"waters of the United States" from the Act's NPDES permitting requirements. The Water

Transfers Rule therefore does not seek to define the types of discharges encompassed by a

statutory provision; instead, it creates and permanently exempts an entirely new class of

discharges from the NPDES system. Accordingly, section 509(b)(1)(F) does not apply to

deprive this court of jurisdiction to hear plaintiff's challenge.

### Conclusion

The Water Transfers Rule does not fall within the ambit of section 509(b)(1)(E) or (F), or

any other subsection of Section 509(b)(1). This court therefore has jurisdiction under the general

federal question statute, 28 U.S.C. § 1331, to hear plaintiff's challenge.

## III. The Water Transfers Rule is a reasonable interpretation of an ambiguous statutory term

The parties raise both procedural and substantive arguments. Procedurally, the parties

disagree on what level of deference the court should afford the EPA's Water Transfers Rule.

Substantively, the parties disagree on whether the EPA's interpretation of Section 502(12) of the

CWA is reasonable.

### A. The Water Transfers Rule is entitled to <u>Chevron</u> deference

The Bureau argues the EPA's Water Transfers Rule is entitled to the deferential standard

of review made applicable to formal administrative rulemaking by <u>Chevron U.S.A., Inc. v.</u>

<u>Natural Resources Defense Council, Inc.</u> ("<u>Chevron</u>"), 467 U.S. 837, 104 S.Ct. 2778 (1984) and

must be upheld as a formal agency interpretation of an ambiguous statutory term. ONRC

counters that the EPA has advanced inconsistent positions with respect to whether "waters" under the CWA implies a single "unitary" water or many separate waters, therefore the Water Transfers Rule is not entitled to the Chevron's deferential standard of review.

Chevron deference does not apply to all agency statutory interpretations. Miranda Alvarado v. Gonzales, 449 F.3d 915, 921 (9th Cir. 2006). The Chevron standard was developed in the context of precedential administrative decisions, where an agency's interpretation of a statute has the force of law. The Supreme Court has since elucidated that Chevron deference applies only where Congress has authorized an agency to make rules carrying the force of law, and the agency interpretation at issue was promulgated in the exercise of that authority. Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 952 (9th Cir. 2009); Garcia-Quintero v. Gonzales, 455 F.3d 1006, 1012 (9th Cir. 2006) (citing U.S. v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164 (2001)). If an agency interpretation does not carry the "force of law," it is due deference only to the extent of its power to persuade based on the factors recited in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161 (1944), and endorsed in Mead. Wilderness Soc'y v. U.S. Fish & Wildlife Serv., 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc).

Here, Congress expressly authorized the EPA to prescribe regulations as necessary to administer the CWA in section 501(a) of the Act, 33 U.S.C. § 1361(a). The EPA promulgated the Water Transfers Rule pursuant to that authority only after notice and comment. 73 Fed. Reg. at 33,700 & 33,706-08 ;71 Fed. Reg. at 32,888. The Rule therefore carries the force of law and is entitled to Chevron deference.

ONRC argues Chevron should not apply because the EPA has advanced inconsistent interpretations of the meaning of the term "navigable waters." Whether the EPA has changed its position on the "unitary waters" theory is irrelevant because "Chevron deference applies to an

Page 50 – REPORT AND RECOMMENDATION

agency's reversal of position." New Edge Network, Inc. v. F.C.C., 461 F.3d 1105, 1112-13 (9th

Cir. 2006) (*citing* Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967,

981-82 & n. 50, 125 S.Ct. 2688 (2005); Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742, 116

S.Ct. 1730, 135 L.Ed.2d 25 (1996)). Accordingly, the court finds that the Water Transfers Rule

is entitled to Chevron deference.

**B. The Water Transfers Rule is a reasonable interpretation of an ambiguous statutory term and must therefore be upheld under Chevron**

ONRC argues the Water Transfers Rule is based on an impermissible interpretation of the

term "navigable waters" and should therefore be held invalid as an unauthorized, ultra vires

abdication of the EPA's duty to protect and preserve the nation's waters. The Bureau argues that

ONRC's argument directly reflects the question squarely at issue in the petitions for review of

the Rule which were consolidated by the Judicial Panel on Multidistrict Litigation and decided

by the Eleventh Circuit in Friends of the Everglades, and further argues that the EPA's

interpretation of "navigable waters" is a permissible construction of an ambiguous statutory term

and must therefore be upheld.

**Standard**

Under the two-step Chevron test, the court first applies the traditional tools of statutory

construction to determine whether the intent of Congress is clearly expressed; if so, that intent

must be given effect as law because both the court and the agency "must give effect to the

unambiguously expressed intent of Congress." Wilderness Soc'y, 353 F.3d at 1059 (*citing*

Chevron, 467 U.S. at 842-43 & n. 9; Defenders of Wildlife v. Browner, 191 F.3d 1159, 1164

(9th Cir. 1999)). Second, if the statute is silent or ambiguous with respect to the specific issue at

hand, the court must defer to the agency's construction of the statute so long as it is reasonable.

Id. (*citing* Chevron, 467 U.S. at 843). At this step, the agency's interpretation of the statute will

be found permissible and must be upheld by the court so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." Id. (*citing* Chevron, 467 U.S. at 844).

### Discussion

The question before the court is whether the discharge of one "water of the United States" containing pollutants to another "water of the United States" constitutes an "addition of a[] pollutant to navigable waters" within the meaning of the CWA, therefore subjecting the polluted water to NPDES permitting requirements. The Water Transfers Rule holds that such discharges are not subject to NPDES permitting requirements. Specifically, the Water Transfers Rule, 40 C.F.R. § 122.3(i), reflects the EPA's interpretation of the statutory term "addition" as used in section 502(12) of the CWA to define "discharge of a pollutant" and "discharge of pollutants." 73 Fed. Reg. at 33,700. The EPA concluded that although pollutants remain pollutants after they are discharged into water and flow downstream, pollutants may only be "added" to the waters of the United States once, at the point where they are first introduced, therefore, activities that convey or connect waters of the United States do not constitute a "discharge of a pollutant[s]" unless the transfer activity itself introduces a new pollutant. Id. at 33,701. In resolving the issue presented, the court must therefore determine (1) whether Congress unambiguously intended to exempt from NPDES permitting requirements activities that convey or connect waters of the United States where the transfer activity does not itself introduce a pollutant or pollutants, and if not, (2) whether the EPA's interpretation of the term "discharge of a pollutant" and "discharge of pollutants" as excluding the transfer of waters containing upstream pollutants is reasonable.

The statute governing consolidation of agency review proceedings, 28 U.S.C. § 2112(a), precludes review of the Water Transfers Rule by this court. When petitions challenging the same

Page 52 – REPORT AND RECOMMENDATION

agency regulation are consolidated by the judicial panel on multidistrict litigation ("JPML") and assigned to a Circuit Courts of Appeal, that court becomes the sole forum for addressing the validity of the challenged regulation. Peck v. Cingular Wireless, LLC, 535 F.3d 1053, 1057 (9th Cir. 2008) (citing MCI Telecomm. Corp. v. U.S. West Communications, 204 F.3d 1262, 1267 (9th Cir. 2000)). Furthermore, opinions issued by other Circuit Courts of Appeal deciding consolidated petitions for review of agency regulations are binding outside that circuit. Id. at 1057 (Eleventh Circuit Court of Appeal's opinion deciding consolidated challenges to validity of FCC's interpretation of statutory term was binding outside the Eleventh Circuit). The validity of the EPA's Water Transfers Rule was challenged in multiple petitions consolidated by the JPML and assigned by lottery to the Eleventh Circuit Court of Appeals, which has issued its decision. In Friends of the Everglades, the Eleventh Circuit Court of Appeals upheld the Water Transfers Rule as a reasonable interpretation of an ambiguous statutory term by the agency charged with administering the Act. 570 F.3d at 1228. On November 29, 2010, the Supreme Court denied petitions for a writ of certiorari filed by plaintiffs Friends of the Everglades, 131 S.Ct. 643, and Miccosukee Tribe of Indians of Florida, 131 S.Ct. 645. On December 2, 2010, the Eleventh Circuit issued its mandate. The Eleventh Circuit's decision is therefore final and binding on this court. See, e.g., W.Va. Highlands Conservancy, Inc. v. Huffman, 625 F.3d 159, 167 (4th Cir. 2010) (finding Water Transfer Rule inapplicable to discharge of acid mine drainage into state streams because "that exception only applies when pollutants are transferred from one navigable water to another").

Even if it were not binding, the court finds Friends of the Everglades to be persuasive and hereby adopts its reasoning and analysis.[21] The Ninth Circuit has not addressed the validity of

---

[21] The Bureau argues ONRC's challenge must be dismissed because it has failed to join the EPA as a defendant in this action. The EPA has a strong interest in the continuing validity of its

the Water Transfers Rule, therefore no binding precedent precludes this result. It is true that the

Ninth Circuit has clearly and unequivocally rejected the premise underlying the "unitary waters"

theory. N. Plains Res. Council v. Fidelity Exploration & Dev. Co., 325 F.3d 1155 (9th Cir.

2003). In particular, the Ninth Circuit specifically rejected the defendant's argument that

groundwater containing naturally occurring contaminants could not be a pollutant subject to

NPDES permitting requirements when discharged into navigable waters because the

groundwater was "unaltered, naturally occurring, and [] only water," finding that "such an

argument cannot sensibly be credited" because it "would allow someone to pipe the Atlantic

Ocean into the Great Lakes and then argue that there is no liability under the CWA because the

salt water from the Atlantic Ocean was not altered before being discharged into the fresh water

of the Great Lakes." Id. at 1162-63. However, at the time of that decision, not only was the

Water Transfers Rule not yet in effect, the EPA had not even given notice of its intent to initiate

the rulemaking process to address water transfers. Therefore, while Fidelity Exploration

suggests that the Ninth Circuit would interpret "addition . . . to navigable waters" differently than

the EPA has, this is irrelevant. On judicial review of an agency's regulation, the issue is not

whether the court would interpret the ambiguous statutory term in the same way or even whether

the agency's interpretation is the best interpretation; it is merely whether the agency's

interpretation is *reasonable*. Chevron, 467 U.S. at 843-44.

---

regulations and its interests should be represented in this case. *See* Jacobsen v. Bonine, 123 F.3d 1272, 1274-75 (9th Cir. 1997) (refusing to address the merits of a claim challenging the administration of an agency program because that agency was not a party to the litigation); McCowen v. Jamieson, 724 F.2d 1421, 1423-24 (9th Cir. 1984) (reversing district court's grant of summary judgment and remanding with instructions to join federal agency as a necessary party to defend its interpretation of regulations). Because the decision of this court upholds the challenged regulation, the disposition of this action does not impair or impede the EPA's ability to protect that interest.

ONRC offers Northwest Environmental Defense Center v. Brown, 640 F.3d 1063 (9th Cir. 2011) in support of its argument that the Water Transfers Rule must be found to be an unreasonable interpretation of an ambiguous statutory term. The regulation at issue in Brown was whether the EPA's Silvicultural Rule, 40 C.F.R. § 122.27, not the Water Transfers Rule. 640 F.3d at 1067. The Silvicultural Rule limits "silvicultural point sources" to the discharge of pollutants to waters of the United States resulting from four specifically enumerated activities and otherwise excludes certain activities as "non-point source silvicultural activities," including, specifically, "road construction and maintenance from which there is natural runoff." Id. at 1077-78 (quoting 40 C.F.R. § 122.27(b)(1)). The plaintiff in Brown sought a determination that stormwater runoff from logging roads collected by the defendant's system of ditches, culverts, and channels and channeled into navigable waters was a discharge subject to NPDES permitting requirements. Id. at 1069.

The Ninth Circuit began by observing that the CWA prohibits the discharge of pollutants from point sources to navigable waters. Id. at 1070. The Ninth Circuit observed that whereas the CWA defines "point source" without regard for whether the fluid discharged from it was the result of natural runoff or controlled water use by a person, the Silvicultural Rule creates a categorical exemption for point source discharges based on the EPA's interpretation that the discharge of natural runoff was not intended to be encompassed within the Act's definition of a discharge of a pollutant. Id. at 1070-71. On review of the legislative history of the Act, the Ninth Circuit concluded that "Congress did not provide the EPA Administrator with discretion to define the statutory terms" and in particular that only Congress had the ability create exemptions to the Act's definition of "point source." Id. at 1072-73 (noting that in 1977 Congress adopted a statutory exemption for agricultural irrigation). Therefore, to the extent the Silvicultural Rule

created categorical exemptions for certain point sources based on the source of the discharge emitted from them, the rule was not based on a permissible interpretation of the CWA. Id. at 1080.

While Brown interprets the validity of a regulatory exemption to NPDES permitting requirements, that regulation at issue there is distinguishable from the Water Transfers Rule. The Silvicultural Rule exempts from NPDES permitting requirements the discharge of pollutants at the point where they first reach a navigable water. Conversely, the Water Transfers Rule seeks to define the point at which the addition of a pollutant first occurs, and to apply NPDES permitting requirements in a manner consistent with the Act's treatment of point and non-point source pollution. Recognizing that it is generally true that the connections between the nation's water are vast and intricate, and that these connections are further complicated as the result of human engineering, the Rule elects to treat artificial confluences of waters of the United States in the same manner as natural confluences are treated. This approach makes sense in view of the cases cited in earlier parts of this opinion, holding that a water does not lose its status as a "water of the United States" as the result of man-made obstacles that interrupt and divert its flow, e.g., Appalachian Elec. Power Co. & Economy Light & Power Co., supra; that a man-made water body can be a "water of the United States," e.g. Henry Bosma Dairy & Headwaters, Inc., supra; and that whether a water flows naturally or artificially into another water is irrelevant to the determination of whether it is a "water of the United States," e.g. Adam Bros Farming, Inc. & Cal. Sportfishing Prot. Alliance, supra.

For the reasons stated above, and in light of the special significance of decisions issued in multidistrict litigation cases, the court finds the Eleventh Circuit's reasoning in Friends of the Everglades to be persuasive and adopts its analysis in this case in concluding that (1) the CWA

Page 56 – REPORT AND RECOMMENDATION

does not unambiguously exempt water transfers as defined by the Water Transfers Rule from NPDES permitting requirements, and (2) the EPA's interpretation of the terms "addition" and "waters" is reasonable. Therefore, under <u>Chevron</u>, the Water Transfers Rule must be upheld.

## RECOMMENDATION

For the reasons stated above, defendants' motion (#198) for summary judgment should be GRANTED and plaintiff's motion (#205) for partial summary judgment should be DENIED.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by February 6, 2012. If objections are filed, any response to the objections is due by February 23, 2012.* See FED. R. CIV. P. 72, 6.

DATED this _____ day of January, 2012.

MARK D. CLARKE
United States Magistrate Judge

Page 57 – REPORT AND RECOMMENDATION